Hillsborough,
No. 5472.

STERGIOS PLEAKAS, *also known as*
STERGIOS PLIAKAS.

*v.*

GEORGE A. JURIS, *also known as* GEORGE JURIS.

Argued September 7, 1966.
Decided October 31, 1966.

*Harkaway & Barry* ( *Mr. Aaron A. Harkaway* orally ), for the plaintiff.

*Nicholas Pantelas*, and *Hamblett, Kerrigan & Hamblett* ( *Mr. Joseph M. Kerrigan* orally ), for the defendant.

DUNCAN, J. The salient facts appear from the following report of the master: " The Petitioner is eighty-five ( 85 ) years old. He was born in Greece and came to the United States in 1907. His formal education was limited to grammar school in Greece and he neither reads, writes nor understands English. His testimony was taken through an interpreter. Petitioner's wife died in July, 1953, leaving him with only one child, his son, Peter.

" The petitionee was also born in Greece and came to this country in 1929. He is fifty-four ( 54 ) years old. He reads and writes English and speaks it fluently. He is a man of considerable business ability and experience, being president and manager of a trucking concern in Nashua, New Hampshire. He is a man of good standing in his community, having been president of the local Greek church for five ( 5 ) years.

" Until the time of the present controversy, the relationship between the petitioner and the petitionee was very close. They had known each other for over twenty-five ( 25 ) years. The petitioner often sought the advice of the petitionee who knew that the petitioner trusted him and had confidence in his counsel and advice. At one point the petitionee described the relationship as close as that of ' father and son '.

" One of the difficulties in the present case is that those who certainly could have shed light on the circumstances were not available. Bolic Degasis, the petitioner's conservator, and Robert J. Doyle, the attorney for the petitioner's son, have passed away. Albert Terrien, who was petitioner's attorney at the time of the hereinafter discussed conveyance of the real estate to the petitionee was not available.

" Prior to 1953, the petitioner and his son, Peter, were owners of two pieces of property, one situated on Kinsley Street and the other on West Pearl Street in Nashua, New Hampshire.

" On the petition of the petitioner himself, Bolic A. Degasis was appointed his conservator by the Hillsborough County Probate Court on March 20, 1952. The petitionee witnessed the signature of the petitioner on the probate petition and had full knowledge of the proceedings. The petitioner, at the time and since, has operated a coffee shop in the West Pearl Street property. Mr. Degasis permitted the petitioner to continue to collect the rents and in general manage the property as he had done prior to the conservatorship.

" The petitioner and his son, Peter, became involved in very

bitter litigation which was tried in the Superior Court in 1953. At the termination of the case, the court issued a decree under the terms of which Peter was to convey his interest in the West Pearl Street property to his father and the petitioner was ordered to deed his interest in the Kinsley Street property to his son, Peter. The relationship between parent and child was so strained that the father would not speak or have anything to do with the son.

" In August, 1953, the petitioner executed a will in which he disinherited his son, Peter, and left all of his estate to the petitionee.

" In November, 1953, Bolic Degasis, as the petitioner's conservator, secured from the Probate Court a license to sell his ward's interest in the West Pearl Street property. This license was returned to the Court in 1955 with an affidavit of the conservator ' that the real estate was never sold under this license '.

" On January 4, 1954, Bolic Degasis, as the petitioner's conservator, conveyed his ward's interest in the West Pearl Street property to the petitionee and his interest in the Kinsley Street property to the petitioner's son, Peter. At the same time, the petitioner's son, Peter, conveyed his interest in the West Pearl Street property to the petitionee. The nature of whatever title the petitionee had in the property was established at the time of this transfer. Whatever happened before or after the transfer is merely evidence to explain the act of January 4, 1954.

" At the time of the transfer, the petitionee believed that the petitioner had the following obligations:

" Balance due on $13,000 note secured by a mortgage upon the premises.

" Money owed the petitionee for prior loans $1,050.

" Note due Vasilow Panagoules $2,580.

" Money due Nicholas Pantelas for legal services of undetermined amount.

" The property had a value of between $25,000 and $27,000.

" The petitionee took the position in his testimony that the property was transferred to him because the petitioner was in financial difficulties and could not get money to meet his debts. No actual money passed from the petitionee to the petitioner or to his conservator. The petitionee further asserted that when he took the property he assumed the above mentioned debts. The petitionee, in his requests for finding by the Master, asked that the transfer be characterized as a completed gift, but this is contrary

to his own testimony and denied by the petitioner. The Master finds and rules that the transfer was not intended by either party to be a gift and was not a gift.

" It is evident from the testimony that this transaction was primarily handled by Messrs. Doyle, Degasis, Terrien and Pantelas, three of whom were not available to testify. Whatever intent may have motivated the petitioner's action was not per- sonally expressed by the petitioner to the petitionee.

" After the transfer, the petitioner continued to manage the rents paid the bills from the rent money, saw to what repairs were needed and the like. He would account to the petitionee annually so that the petitionee could have the proper figures for his income tax return. It is the petitionee's position that he allowed the petitioner to manage the property as owner so as not to offend the petitioner's pride. Prior to the final mortgage, the petitionee rewrote the original mortgage three times in order to secure small amounts for payment of obligations growing out of the property. In addition the petitionee paid out of his own pocket money for certain insurance and tax bills on the West Pearl Street property but these he considered as loans to the petitioner, due to the fact that the petitioner failed to use rent money to meet these obligations.

" In the spring of 1962 the petitioner was alerted by rumors that he heard and by statements made to him by others that the petitionee was claiming full ownership of the property. He then made a demand upon the petitionee for a re-conveyance of the property. At sometime prior to July 2, 1962, the petitioner's attorney made a demand upon the petitionee for re-conveyance. The petitionee complied and deeded the property back to the petitioner. However, before making the conveyance, he increased the mortgage on the property to $14,125. From the proceeds of the mortgage he paid Vasilow Panagoules $1,500, Attorney Pantelas $2,000 and himself $3,502.95, — the latter being based upon loans claimed to have been made to the petitioner.

" The Master finds and rules that the transaction of January 4, 1954, did not create a resulting trust in favor of the petitioner. The intent of the petitioner in transferring the property was not conveyed to the petitionee.

" However, the Master finds and rules that there was a con- structive trust impressed upon the property in favor of the petitioner. While there was no evidence upon which it could be

found that the petitionee was fraudulent or had any intent to defraud the petitioner, the relationship between them was confidential in nature. For a great many years prior to the conveyance, the petitioner had relied upon the petitionee for advice and counsel and the petitionee was well aware of this reliance. The relationship was close to that of father and son. The petitionee knew that the petitioner was under great strain because of his differences with his son. He knew his age and his lack of understanding of English. He knew he was under conservatorship at the time. He knew that, even if he personally assumed the petitioner's mortgage and debts, he was securing the property at considerably less than its actual value. After the conveyance of January 4, 1954, the petitioner was permitted to continue to act as owner. When a demand was made for re-conveyance the petitionee readily complied.

" As mentioned above, while difficulties of proof have arisen in this case due to the death of certain of the participants, still the petitioner, by the petitionee's conduct in allowing him full ownership rights in the property, was lulled into a sense of security. As soon as he heard rumors that his position might not be that of owner, he took action. He cannot now be barred on any theory of laches or statutory limitations from asserting his rights.

" The Master recommends that it be decreed that the petitionee held title to the West Pearl Street property as constructive trustee in favor of the petitioner, and that the petitionee be ordered to account to the petitioner for his management of the property and his use of funds received by loan secured by mortgages upon the property. "

Since the property in question was in fact reconveyed by the defendant to the plaintiff before this action was commenced, the question of whether title was held for the benefit of the plaintiff during the preceding eight years is of consequence only as it affects the plaintiff's right to an accounting for the proceeds of the 1962 loan. Since the loan was essentially a product of the real estate, the plaintiff is entitled to an accounting if the real estate was subject to a trust in his favor. Restatement, Restitution, s. 160, *comment* h.

The defendant maintains that the evidence furnishes no basis for the ruling that there was a constructive trust, because there was no evidence of any promise by the defendant that he would hold the property for the plaintiff, or reconvey the same upon request.

*Kachanian* v. *Kachanian*, 100 N. H. 135, 137, 138. See 1 Scott on Trusts, *s.* 44.2. " We may imply a trust on an oral promise to reconvey, " is the argument made, " but we should not then imply the promise so that we can use the implied promise as the basis for the implied trust. "

While the master found that a confidential relationship existed between the parties, no express finding was made of any promise by the defendant that he would hold the property for the plaintiff. The defendant argues that no such finding should be implied, because the master found that the plaintiff's intent was not expressed by him "personally" to the defendant. The only express finding as to the intention of either party was that the conveyance was not intended to be a gift. However, the ruling that a con-structive trust arose necessarily implies a finding that the defendant undertook to hold the title for the benefit of the plaintiff rather than himself.

Such a finding was warranted by the evidence. The evidence clearly showed that the defendant took title in order to borrow funds with which to pay the plaintiff's debts. Prior to the transfer, the plaintiff and his son had been joint owners of two properties, both subject to mortgage. Following the litigation between father and son, the plaintiff's half interest in one property was conveyed to the son, and the son conveyed his half interest in the other property to the defendant. Before this exchange was effected, the plaintiff sought to borrow $13,000 but found that the bank would not make the loan on the property in question because of the plaintiff's advanced years. The defendant testified that this fact was known to him. After the conveyances by the son and the father's conservator to the defendant, the latter borrowed the $13,000 from the bank, and the proceeds were used to satisfy the plaintiff's share of the prior mortgage indebtedness.

A vice president of the lending institution testified that the defendant told him " that is why he acquired title so that he could do the borrowing for Mr. Pleakas. " The plaintiff testified that he told the defendant to " put the house in his name. Temporarily until I fix things up with my son, " and gave him funds to pay for the cost of conveyancing.

After the transfer the plaintiff continued to operate his coffee house in the transferred premises, rent free, collected the rents from the balance of the premises, received and paid the bills, and in general was permitted to act as beneficial owner. On one

occasion when income was not available to pay taxes the defendant advanced the necessary funds, and testified that he treated the transaction as a " loan " to the plaintiff.

The defendant's contention that a promise to hold the premises for the plaintiff may not be implied is not supported by the authorities. "Although the promise must be shown, it need not be expressed orally. It may be inferred from the grantee's silence . . . or from acts of acquiescence at the time of the imposition of the condition and the conveyance." *Comment*, 29 Fordham L. Rev. 561, 569. "B's promise may be express or implied. It may be inferred from silence." Bogert, Trusts & Trustees (2d *ed.*) *s.* 499, and cases cited.

In *Sinclair* v. *Purdy*, 235 N. Y. 245, 253, 254, an opinion by *Cardozo*, J., the Court of Appeals said: "It is not the promise only, nor the breach only, but unjust enrichment under cover of the relation of confidence, which puts the court in motion. . . . Even if we were to accept [the defendant's] statement that there was no distinct promise to hold it for [the grantor's] benefit, the exaction of such a promise, in view of the relation, might well have seemed to be superfluous. . . . Though a promise in words was lacking, the whole transaction, it might be found, was ' instinct with an obligation ' imperfectly expressed ( *Wood* v. *Duff-Gordon*, 222 N. Y. 88, 91 )." See also, 1 Scott on Trusts, *s.* 44.2. *pp.* 320, 321.

The finding and ruling of the master that "there was a constructive trust impressed upon the property" in favor of the plaintiff is sustained. Restatement (Second), Trusts, *s.* 44. It follows that the plaintiff was entitled to an accounting of the product of the property in the form of the proceeds of the mortgage loan of June 27, 1962. Restatement, Restitution, *s.* 160, *comment* h, *supra*; 4 Powell, Real Property, *s.* 594.

The defendant's exceptions to the denial of his motions to dismiss upon the ground that relief was barred by laches and by the statute of limitations are without merit, in view of the findings that the plaintiff acted as soon as he learned in 1962 that the defendant might be claiming full ownership of the property.

*Exceptions overruled.*

All concurred.